**UNITED STATES DISTRICT COURT FOR THE**

**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------

HAO TANG,

               Plaintiff,

   -against-

SHADYSIDE PARTNERS, LLC (*d/b/a*
CULPER RESEARCH) and CHRISTIAN
LAMARCO,

          Defendants.

-------------------------------------------------------

Case No. 1:26-cv-05018

**COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff Hao Tang ("Tang"), by and through his undersigned attorneys, alleges as follows against Defendants Shadyside Partners, LLC (*d/b/a* Culper Research) ("Shadyside" or "Culper") and Christian Lamarco ("Lamarco") (collectively, "Defendants"):

## NATURE OF THE ACTION

1. Hao Tang built his well-earned reputation as a successful businessman through hard work, sharp intellect, and astute investment strategies. Christian Lamarco is a so-called "short seller" who tried to get rich quick by issuing a false, defamatory, and salacious report baselessly accusing Tang of criminal and other nefarious acts. This lawsuit seeks to correct this greedy misconduct.

2. Lamarco created a "research firm" called Shadyside (d/b/a Culper Research) solely to concoct defamatory, baseless "research reports" about publicly traded companies that Lamarco has taken a short position in so he can cash out when the companies' stock prices drop due to Shadyside's "investigative" reports. By using Shadyside, Lamarco will quite literally say—and has said—anything and everything to make money in the market. As a result, he and Shadyside have become repeat defamation defendants.

1

3.      Left in the wake of Lamarco's shameless defamatory campaigns is a trail of actual, legitimate businesspeople like Tang.  This lawsuit is being brought to vindicate Tang's reputation because, although the First Amendment is meant to protect and foster free expression and the exchange of ideas, there is no world in which it can shield and protect baseless claims that a person is engaged in espionage and Chinese intelligence operations, money laundering, human trafficking, illegal gambling, propaganda networks, and murder-for-hire that the author knows are fabricated.

4.      Lamarco set his sights on Tang in June 2025 as part of his effort to crash the stock price of AppLovin Corporation, a publicly traded technology company.  In his report, "Shadyside" (really Lamarco) admits it held a short position in AppLovin and stood to profit if AppLovin's stock price declined.  To manipulate the stock price to decline, Defendants published a "research report" titled *AppLovin (APP): Behind the Red Curtain – CCP Intelligence, Human Trafficking, Money Laundering; Undisclosed Stock Pledges; Secret Chinese e-Commerce Deals* (the "Report"), which accuses AppLovin and its investors of criminal and other nefarious misconduct. Ex. A, Report.

5.      To increase readership and to inflict maximum damage on AppLovin's stock price, Defendants did not just criticize the company, but also personally attacked Tang.  Tang is a private citizen who has neither worked for nor been an officer, director, or representative of AppLovin. Even so, Defendants claimed that Tang "backed" and had "involvement" in AppLovin, then drew fictitious connections between Tang and Chinese government intelligence and propaganda operations and, at the same time, accused him of money laundering, fraud, and human trafficking. All false, sensational allegations with no factual basis.

-2-

6.      Defendants' report cites and quotes from various financial records, public news reports, and a UK tribunal decision, but it takes pieces from these sources out of context, intentionally misrepresents them, and twists the facts to satisfy Defendants' sensational profit-motivated narrative.  A careful reading of these sources shows that Defendants must have known that their statements about Tang were false when Defendants published them.

7.      Regardless, Defendants published the false statements to a global audience through the Culper Research website and social media platforms, tearing down Tang's reputation with reckless disregard for how much collateral damage such false statements would cause, purely in their efforts to crash AppLovin's stock price and line Shadyside's and Lamarco's own pockets. And when Tang notified Shadyside of the glaring inaccuracies in its report, Shadyside refused to reconsider its publication, even while at least one other short seller publicly acknowledged that their own similar report lacked evidence and issued a retraction.

8.      By publishing these false and defamatory statements, Defendants permanently damaged Tang's reputation and credibility and impaired his ability to do business in the United States and around the world.

## PARTIES

9.      Plaintiff Hao Tang is a Cypriot citizen, with his primary residence in Hong Kong SAR.

10.     Defendant Shadyside Partners, LLC, is a limited liability company organized under the laws of the State of Delaware (File No. 7492050).  Shadyside operates under the name Culper Research, which maintains its principal place of business in New York, New York.

11.     Defendant Christian Lamarco is an individual residing in New York, New York. On information and belief, Lamarco, at all relevant times, oversaw, directed, authorized, authored,

and/or was responsible for the publication of defamatory statements about Tang published in the June 2025 report.

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity between the parties and the amount in controversy exceeds the sum of $75,000.

13.     The Court has personal jurisdiction over Defendant Lamarco because he is a resident of New York.  The Court has personal jurisdiction over Defendant Shadyside Partners, LLC, because, upon information and belief, its sole member, Lamarco, is a citizen of New York.

14.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants are citizens of New York and, separately, pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of New York.

## FACTUAL ALLEGATIONS

### A.  Hao Tang is a law-abiding, successful businessman.

15.     Tang was born in China.  He graduated from a prestigious university in China, then rose through various leadership positions at different Chinese companies before relocating to Hong Kong.

16.     In Hong Kong, Tang founded and established the Goldenway Group ("Goldenway").  Goldenway was a financial services platform with regulatory licenses across multiple jurisdictions, including from the Chinese Gold and Silver Exchange, the Securities and Futures Commission in Hong Kong, and the Financial Conduct Authority ("FCA") in the United Kingdom.

-4-

17. Tang took the helm when Goldenway was founded, then entrusted the group to different management teams to develop the business. Over the past decade and longer, Tang has maintained a philosophy of passive investment, providing capital and investment guidance to management teams he believes can execute and deliver transformative business visions. Over time, Tang has increased his focus on high-tech investments, balancing high-growth, short-term and slow-growth, long-term opportunities. In June 2024, Tang founded Tier One Investment Management ("Tier One") based on these strategies.

18. Tang currently serves as a director of Tier One, which is a licensed investment manager regulated by the Cayman Islands Monetary Authority.

19. Tang's notable portfolio investments include AppLovin, a global technology company; MediaPro, a leading media enterprise; and Flutter, a prominent technology platform.

20. Tang's investment in AppLovin reflects his longstanding philosophy of passive investment. He has never participated in AppLovin's day-to-day management, meetings, or email communications, nor has he ever met AppLovin's co-founder and CEO, Adam Foroughi. Public records show that Tang never held any Class B shares of AppLovin, which at the time of the Initial Public Offering in April 2021 controlled 93.4% of voting shares, leaving no room for control for any Class A shareholders, including Tang.

**B. Shadyside publishes defamatory reports to benefit its short positions.**

21. Shadyside does business under the name Culper Research, which presents itself as an investigative financial firm and activist short seller. Shadyside tells its readers that they can rely on Culper, because Culper takes "an exhaustive investigative approach to investment research" and "seek[s] to expose companies which have misrepresented their operations, failed to

disclose significant risks, misused capital, possess accounting irregularities, or otherwise deceived investors."[1]

22.     But in practice, Shadyside publishes materially false, misleading, and defamatory statements asserting that the market has mispriced the target company's stock. By doing so, Shadyside seeks to artificially depress the company's share price and profit by rapidly closing their positions after publishing. Lamarco authors these false reports, and Shadyside publicly admits that it holds positions in the securities addressed in its false reports. This is illegal market manipulation.[2]

23.     Since 2019, Shadyside has published more than 50 short reports on its website and disseminated its so-called "findings" on Culper Research's X account, @CulperResearch, which has nearly 40,000 followers. Shadyside has established a pattern of taking short positions and reaping profits when these reports move markets.

24.     Shadyside relishes in the destruction it causes companies and their shareholders. In a March 20, 2024 post on X, Shadyside compared itself to the Grim Reaper, going door to door, eliminating its targets with a smile.

---

[1] https://culperresearch.com/about-us/.
[2] *See, e.g.*, "U.S. jury finds investor Andrew Left guilty of securities fraud," CNBC.com, June 2, 2026, https://www.cnbc.com/2026/06/02/us-jury-finds-investor-andrew-left-guilty-of-securities-fraud.html.



**Culper** ✓
@CulperResearch

X.com

New report tomorrow. Multibillion-dollar company, GC borrow. See you then.



4:38 PM · 3/20/24 · **22K** Views

💬 4        ↻ 9        ♡ 73        🔖 7        ⬆

### C. Shadyside and Lamarco target AppLovin by defaming Tang.

25.    On June 12, 2025, Defendants published a report accusing AppLovin and Tang of misleading investors, engaging in criminal conduct, and maintaining nefarious connections with the Chinese Communist Party ("CCP").  Defendants published the Report, titled *AppLovin (APP): Behind the Red Curtain – CCP Intelligence, Human Trafficking, Money Laundering; Undisclosed Stock Pledges; Secret Chinese e-Commerce Deals*, on the Culper Research website and on its X account.

26.    Despite the publicly known fact that Tang is not and never was a director or executive at AppLovin, the Report claims that the company has been "backed since at least 2017

by Chinese national Hao Tang" and that AppLovin "obfuscated disclosures" to hide Tang's investment in AppLovin from investors. The Report then launches into 30 pages of cherry-picked facts, twisted to leave the reader with the false impression that Tang himself is engaged in nefarious criminal activity such that his investment in AppLovin should concern investors.

27.    The Report includes at least 14 false and defamatory statements that accuse Tang of involvement in criminal conduct and that he maintains nefarious connections with the CCP.

> **i.    Shadyside and Lamarco falsely accuse Tang of money laundering and fraud.**

28.    Throughout the Report, Defendants falsely assert that Tang is involved in money laundering and fraud. They write: "**Further, our research reveals Hao Tang's numerous ties to…money laundering**," "**Hao Tang holds numerous ties to…money laundering operations**" and "**Tang's network is involved in money laundering… . Tang's background disqualifies AppLovin's pursuit of TikTok's ex-China business, and AppLovin's misleading disclosures around Tang's ownership suggests a cover-up.**" Report at 2, 4, 29.

29.    In fact, Shadyside's research reveals only sporadic commercial connections between entities once affiliated with Tang and individuals who were later accused of misconduct. None of the documents cited in the Report demonstrate that Tang had knowledge of, participated in, or profited from any money laundering or fraud scheme. Yet Defendants say that these "ties" are sufficient to prove Tang is a bad actor and that his investment in AppLovin disqualifies the company from new opportunities.

30.    To try to substantiate its false claim that Tang engaged in money laundering and fraud, Defendants misrepresent a UK tribunal decision involving part of the Goldenway Group. Defendants equate Goldenway with Tang. Defendants then write, "**In 2017, the U.K.'s Financial Conduct Authority (FCA) imposed restrictions on Goldenway's UK arm after a**

**whistleblower alleged that the company engaged in money laundering, fraudulent intercompany loans, and had attempted to secure a work visa for a Chinese intelligence agent. In 2024, the UK employment tribunal ruled in the whistleblower's favor, validating the claims and awarding the whistleblower £560,000**." Report at 14.

31.     By this time, Tang was already a passive investor in Goldenway UK. He was not involved in management or operations, and he knew nothing about the matters alleged by the whistleblower. So it is misleading to equate Tang with Goldenway UK.

32.     Moreover, Defendants present this as if the UK tribunal investigated the whistleblower's claims and found them to be true. This intentionally conflates two different proceedings and mischaracterizes the outcome of each.

33.     In the 2017 proceeding, the FCA denied Goldenway UK's application for an individual named Gregory Nathan to serve as a compliance officer, because it found Nathan was not qualified.[3] The Notice denying this application has nothing to do with the whistleblower disclosures—those disclosures were made five years later.

34.     The 2024 matter was about wrongful dismissal in which the Tribunal was tasked only with determining whether the whistleblower made "qualifying public interest disclosures" and thus whether his employment may have been improperly terminated.[4]

35.     The Tribunal "validated" the claims that the employee was unfairly dismissed because he genuinely believed his allegations when he made these disclosures, not because the Tribunal determined that the misconduct alleged in the disclosures had in fact occurred, as the Report wrongfully implies.

---

[3] *Final Notice*, Financial Conduct Authority, Ref. Nos. FRN185223, GRN01018, Aug. 21, 2017, available at https://www.fca.org.uk/publication/final-notices/goldenway-global-investments-uk-limited.pdf.
[4] *B Bhagani v. Goldenway Global Investments (UK) Ltd.*, Case No. 2207960/2022, available at Mr_D_Bhagani__vs_Goldenway_Global_Investments__UK__Limited_.pdf.

36.    Defendants positioned this statement in the Report just above a screenshot from the UK Employment Tribunal Judgment that appears to list the Tribunal's findings, giving readers the impression that the Tribunal found the company to be engaged in the listed misconduct.  But that is a blatant misrepresentation: this is the list of what the claimant disclosed, as shown below.

> In 2017, the U.K.'s Financial Conduct Authority (FCA) imposed restrictions on Goldenway's UK arm after a whistleblower alleged that **the company engaged in money laundering, fraudulent intercompany loans, and had attempted to secure a work visa for a Chinese intelligence agent**. In 2024, the UK employment tribunal ruled in the whistleblower's favor, validating the claims and awarding the whistleblower £560,000.
>
> a. Unauthorised appointments of two Hong Kong residents as directors to Companies House without approval from the FCA
> b. Money laundering:  GWFX's profits from CFD trading with the respondent were transferred via disguised 3rd party payments to bank accounts in Hong Kong and Taiwan and London, designed to disguise the true origins and source of funds being GWFX in Vanuatu.  The claimant says the respondent was seeking to move the money by appointing new directors.
> c. Mr Luen was based in HK but was undertaking duties as a director he was not authorised to undertake.
> d. The issue of alleged Chinese espionage which led to him being interviewed by the UK authorities:  he states that the Group COO has *"requisitioned the visa for the Chinese Agent"*.
> e. Mind and management of the firm is in HK where decisions are made by unauthorised persons.
> f. Fraudulent intercompany loans.  Connected with (b) above, GWFX has *"no account anywhere in the world which would accept"* the CFD profits it made from its trades with the respondent.  These profits, says the claimant, were *"loaned"* to a subsidiary of Goldenway PM, Goldenway Japan Co. (GWJ) and held in segregated client accounts in Hong Kong and London *"there is no rationale for holding these fundings … expect to provide a false impression to FSA in Japan of the [Capital Adequacy Ratio] of GWJ"*.  He said that GWJ had recently tried to withdraw these funds, but he did not authorise, *"citing money laundering issues."*  He said his attempts to return these funds to GWFX *"have had no success"*.
>
> Source: *UK Employment Tribunal Judgement*

Report at 14

49. The next day, 21 July 2022 the claimant wrote to the Supervision Team, FCA by email and post. He stated he was disclosing in pursuance of *"Senior Conduct Rule 4"* the following information (97-99):

   a. Unauthorised appointments of two Hong Kong residents as directors to Companies House without approval from the FCA

   b. Money laundering: GWFX's profits from CFD trading with the respondent were transferred via disguised 3rd party payments to bank accounts in Hong Kong and Taiwan and London, designed to disguise the true origins and source of funds being GWFX in Vanuatu. The claimant says the respondent was seeking to move the money by appointing new directors.

   c. Mr Luen was based in HK but was undertaking duties as a director he was not authorised to undertake.

   d. The issue of alleged Chinese espionage which led to him being interviewed by the UK authorities: he states that the Group COO has *"requisitioned the visa for the Chinese Agent"*.

   e. Mind and management of the firm is in HK where decisions are made by unauthorised persons.

   f. Fraudulent intercompany loans. Connected with (b) above, GWFX has *"no account anywhere in the world which would accept"* the CFD profits it made from its trades with the respondent. These profits, says the claimant, were *"loaned"* to a subsidiary of Goldenway PM, Goldenway Japan Co. (GWJ) and held in segregated client accounts in Hong Kong and London *"there is no rationale for holding these fundings … expect to provide a false impression to FSA in Japan of the [Capital Adequacy Ratio] of GWJ"*. He said that GWJ had recently tried to withdraw these funds, but he did not authorise, *"citing money laundering issues."* He said his attempts to return these funds to GWFX *"have had no success"*.

UK Judgment at 11

37.     Defendants knew that including this screenshot out of context, together with their statement that the Tribunal validated the whistleblower's claims, would lead people to believe Shadyside's statements were true when they were in fact false.

38.     Defendants cited and quoted from the UK tribunal's judgment repeatedly, albeit misleadingly, and therefore knew that the Tribunal had not investigated or concluded that the whistleblower's claims were in fact true. Thus, Shadyside knew that its publication telling readers that the allegations of criminal wrongdoing by Goldenway were "validated" was false and misleading at the time of publication.

ii.    **Shadyside and Lamarco falsely accuse Tang of human trafficking and murder-for-hire.**

39.    Throughout the Report, Defendants falsely assert that Tang is involved in illegal human trafficking and murder-for-hire.    They write, "**our research reveals Hao Tang's numerous ties to…human trafficking operations," "Hao Tang's numerous connections tie to…human trafficking…, murder for hire, and other such unsavory operations**" and "[w]e believe Hao Tang is a bad actor with extensive direct and indirect ties to…human trafficking**."    Report at 2, 4, 13.

40.    This is false.    At most, Defendants' research identified two individuals with whom Goldenway entities may have done business who were after-the-fact accused of criminal misconduct.

41.    To try to substantiate its false human trafficking claim, Defendants write: "**In 2021, Hao Tang appears to have lent money to Huang Youlong via JC International Finance (formerly Goldenway Finance).    Youlong was later linked to Myanmar's infamous KK Industrial Park—called a 'fraud factory, and a human trafficking hub' run in part by Youlong's cousin, She Zhijiang, and associated with former Chinese triad leader 'Broken Tooth.'**"    Report at 4.

42.    Whether an entity associated with Tang lent money to someone whose cousin was later found to be engaged in criminal activity, on its own, has no bearing on Tang's character or AppLovin's legitimacy.    By including this purported connection in their report that portrays Tang as a criminal and someone who investors should be concerned about, Defendants baselessly tell readers that Tang himself had a role in or at least was complicit in the alleged human trafficking.

43.    In fact, public records prove that, at the time the alleged loan was made, Goldenway Group had already disposed of Goldenway Finance and its money lending license to a third party,

which changed the entity name to JC International Finance.  Tang was wholly unaware of and had no involvement in the alleged loan.

44.    Defendants also rely on the fact that a casino whose operator has been "linked to multiple Chinese espionage and human trafficking operations" once erroneously identified Goldenway as its managing company.  Report at 21.  They write: "**Hao Tang and his associates are also tied to FortuneGate (aka Frontier Capital Group), a Philippines casino operator tied to Chinese national Liduan Wang, who in turn has been linked to multiple Chinese espionage and human trafficking operations.**"  *Id*.

45.    Defendants cite a public announcement that stated that the casino's management company, FortuneGate Holdings Philippines, Inc. ("FHP") was "part of Hong Kong's Goldenway Investment Holdings Limited Group."  *Id.*  Defendants admit that the company promptly issued a correction clarifying that FHP was not part of Goldenway, but they dismiss the correction as "an attempt to distance Goldenway" without citing any basis.  *Id*.

46.    Regardless, Defendants base their assertion that Tang was involved in human trafficking solely on the fact that Liduan Wang served for a time as the Chairman of FHP.  That Wang served as chairman of a company does not and cannot establish that others involved in that company were involved in Wang's alleged illegal activities.  Defendants' representations to the contrary are false and defamatory.

47.    Incredibly, Defendants stretch this conspiracy theory even further, suggesting to readers that Tang was somehow involved in a murder-for-hire plot because Wang was "reportedly tied to the Nine Dynasty Casino junket," which news reports claimed was "used to launder ransom payments and the paid murder of Chinese steel magnate Anson Que."  Report at 23.  There is only one reason why Defendants would include this information in a report about Tang and his

investment in AppLovin: to convince investors that Tang himself was somehow involved, cannot be trusted, and so they should divest.  This narrative is entirely false, but it serves Defendants' purpose, and so they used it.

> **iii.    Shadyside and Lamarco falsely accuse Tang of supporting Chinese intelligence, collaborating with CCP propaganda outlets, and assisting the CCP with disappearing citizens.**

48.    In addition to the false criminal accusations addressed above, Defendants also falsely assert that Tang maintains nefarious ties with the CCP.  They write that Tang has "**numerous ties to the CCP**" and "**numerous ties to Chinese intelligence [and] CCP propaganda outlets**."  Report at 2, 4.

49.    Once again, Defendants' own research does not support their false assertions. Instead, the Report identifies innocuous associations and distorts the facts to make readers believe that these associations are evidence of criminal wrongdoing by Tang.

50.    To try to substantiate its false claim that Tang maintains nefarious ties with the CCP, Defendants write: "**Hao Tang also appears to be linked to the 2023 disappearance of former CCP state journalist Fu Xiaotian and State Councilor Qin Gang, suggesting he retains high-level CCP connections**."  Report at 16.  In 2023, Qin and Fu disappeared after reports that they had a child via U.S. surrogate.  Defendants accuse Tang of being involved based solely on reports that Fu was last seen boarding a jet that Defendants say Goldenway Investments operated.  They write: "Fu was last seen boarding a jet to Beijing.  The jet was registered to a Utah trust, disguising its ownership.  However, our review of purchase records, FAA records, and ADS-B logs reveal that Tang's Goldenway Investments operated the jet, suggesting he retains high level CCP connections."  Report at 4.

51.     By publishing this statement, Defendants imply that Tang helped the CCP disappear the individuals by authorizing use of his jet.  This, too, is false and misleading.  Tang does not know Qin or Fu, other than public information generally available online.

52.     The documents that Defendants cite do not establish that the CCP had any role in Fu's purported flight on the jet in question, nor do they offer any evidence that Tang was involved in coordinating or approving the flight.

***

53.     Defendants end their report by telling readers that these alleged connections to criminal activity are proof that Tang himself is engaged in wrongdoing and thus untrustworthy: **"Tang's network is involved in money laundering, human trafficking, illegal gambling and data-harvesting. … Tang's background disqualifies AppLovin's pursuit of TikTok's ex-China business, and AppLovin's misleading disclosures around Tang's ownership suggests a cover-up**."  Report at 29.  Given Defendants' lack of evidence that Tang participated or was even aware of any of the alleged misconduct, this conclusion is absurd and confirms that Defendants intended to persuade readers that Tang himself is a criminal.

**D.  Tang raises concerns, but Shadyside and Lamarco refuse to correct their report.**

54.     Concerned about the damage to his reputation caused by Defendants' false and defamatory Report, Tang, through his lawyers, sent multiple letters to Shadyside identifying the inaccuracies and requesting a correction.

55.     In December 2025, Tang wrote to Shadyside and Lamarco, identified the false statements in the June 2025 Report, and asked that they remove the baseless Report from their website.

56.     Shadyside and Lamarco refused to respond.

57.     On January 8, 2026, Tang tried again.  He sent a detailed, eight-page letter to Shadyside identifying the specific defamatory statements found in the June 2025 Report.  This letter also explains how these statements misrepresent Tang and why these statements are false. The letter concludes with a request that Shadyside withdraw the Report and issue a retraction.

58.      Shadyside did not respond.

59.     On January 22, 2026, Tang sent a third demand letter.  This letter also identified the false statements in the Report.

60.     This time, Shadyside responded, but refused to retract or correct any of the false statements.

61.     Tang sent a similar letter to another short seller, CapitalWatch, which had published some of the same false statements asserting that Tang was involved in criminal activity.  When faced with the information Tang provided, CapitalWatch retracted its report and informed readers that its "[d]escriptions asserting direct connections between Mr. Tang and [various individuals] were inaccurate and failed to meet our publication standards. … In light of these factual discrepancies—and to prevent the spread of misinformation and protect the legal rights of the parties involved—we have decided to remove and retract the passages relevant to Mr. Tang personally."

62.     CapitalWatch also issued a public apology: "CapitalWatch extends its sincere apologies to Mr. Tang for the distress caused and the potential impact on his personal reputation."

63.     CapitalWatch's retraction and apology were widely reported on.  For example, CNBC, Yahoo Finance, and Investopedia each published articles discussing the retraction.

64.    Defendants were unfazed by their peer publicly admitting that statements about Tang in the CapitalWatch and the Culper Report are false.  The Culper Report and related social media posts remain publicly available as of the date of filing, without any correction.

## CLAIM FOR RELIEF

### FIRST CAUSE OF ACTION
### Defamation *Per Se*

65.    Tang incorporates by reference all preceding paragraphs.

66.    On June 12, 2025, Defendants authored, published, and widely disseminated the Report without privilege or authorization.

67.    Without regard for the truth, Shadyside and Lamarco falsely stated that Shadyside's "research reveals Hao Tang's numerous ties to the CCP, money laundering, illegal gambling, and human trafficking operations," and that "Hao Tang holds numerous ties to Chinese intelligence, CCP propaganda outlets, human trafficking, and money laundering operations."

68.    These statements are false because, at most, Shadyside's research "reveals"  that companies Tang has been affiliated with conducted sporadic business transactions with individuals later alleged to be involved in criminal misconduct, with no indication that Tang was personally involved in those transactions or that he was aware of the alleged misconduct at the time he interacted with such individuals.

69.    These statements also falsely imply to readers that Tang himself was or is directly involved in the criminal misconduct or that he was complicit.  In fact, Defendants have no evidence that Tang is directly involved in or complicit in any criminal misconduct.

70.    Shadyside and Lamarco also falsely implied that Tang was involved in and permitted money laundering and fraud by writing that "[i]n 2017, the U.K.'s Financial Conduct Authority (FCA) imposed restrictions on Goldenway's UK arm after a whistleblower alleged that

the company engaged in money laundering, fraudulent intercompany loans, and had attempted to secure a work visa for a Chinese intelligence agent.  In 2024, the UK employment tribunal ruled in the whistleblower's favor, validating the claims and awarding the whistleblower £560,000."

71.     This statement falsely implies that Tang was involved in and aware of the money laundering and fraud that the whistleblower reported, and that the UK tribunal found the whistleblower's allegations true.  In fact, the Tribunal found only that the whistleblower genuinely believed his allegations were true when he made the disclosures and thus that the whistleblower was improperly terminated.  The Tribunal made no legal finding on the accuracy or truth of the underlying allegations against Goldenway UK, and nothing in the Tribunal's judgment implicates Tang.

72.     Shadyside and Lamarco also falsely implied that Tang was involved in criminal human trafficking and murder-for-hire by writing the following defamatory statements:

(a)     "Our research reveals Hao Tang's numerous ties to…human trafficking operations."

(b)     "Hao Tang's numerous connections tie to…human trafficking…, murder for hire, and other such unsavory operations."

(c)     "We believe Hao Tang is a bad actor with extensive direct and indirect ties to…human trafficking."

(d)     "In 2021, Hao Tang appears to have lent money to Huang Youlong via JC International Finance (formerly Goldenway Finance).  Youlong was later linked to Myanmar's infamous KK Industrial Park—called a 'fraud factory, and a human trafficking hub' run in part by Youlong's cousin, She Zhijiang, and associated with former Chinese triad leader 'Broken Tooth.'"

(e)    "Hao Tang and his associates are also tied to FortuneGate (aka Frontier Capital Group), a Philippines casino operator tied to Chinese national Liduan Wang, who in turn has been linked to multiple Chinese espionage and human trafficking operations."

73.    In reality, Shadyside's research revealed, at most, that a company previously but no longer associated with Tang lent money to a borrower whose cousin was later charged with human trafficking. Shadyside's own research—cited and addressed in the Report—provides no evidence that Tang himself was involved in making the loan, that he was aware of the human trafficking allegations at the time of the loan, or that Tang was otherwise involved in criminal activity involving Youlong or Zhijiang in any way.

74.    Likewise, Shadyside's own research confirms only that Wang served at one time as chairman of FHP, not that Tang or anyone else was involved in Wang's alleged illegal conduct.

75.    Shadyside and Lamarco also falsely implied that Tang maintains nefarious connections with the CCP and that he assisted the CCP in causing the disappearance of two Chinese citizens. Defendants wrote:

(a)    "[O]ur research reveals Hao Tang's numerous ties to the CCP… ."

(b)    "Hao Tang holds numerous ties to Chinese intelligence [and] CCP propaganda outlets… ."

(c)    "We believe Hao Tang is a bad actor with extensive direct and indirect ties to Chinese espionage [and] CCP state-sponsored propaganda… . Indeed, seemingly every piece of Hao Tang's empire we peeled back revealed either CCP interests or nefarious activity."

(d)    "In 2024, a UK tribunal ruled in favor of a whistleblower at Hao Tang's Goldenway Group, who exposed Goldenway's attempt to…sponsor a Chinese intelligence agent for UK citizenship."

(e)    "Hao Tang also appears to be linked to the 2023 disappearance of former CCP state journalist Fu Xiaotian and State Councilor Qin Gang, suggesting he retains high-level CCP connections."

76.     All that Shadyside's research shows is that a company that Tang was affiliated with operated the jet that Fu was allegedly seen boarding. It does not show that the plane was involved in Fu's disappearance. It does not show that Tang was aware of whether or how the plane was used. It does not show that Tang made any decisions regarding how the plane was used. And it does not show any connection whatsoever between Tang and the CCP. And yet, that is what Defendants intended for their audience to believe.

77.     In addition to accusing Tang of criminal conduct, Defendants' statements injure Tang in his trade, business, and profession as an investor and entrepreneur, and are therefore defamatory per se under New York law. Defendants assert that "Tang's network is involved in money laundering, human trafficking, illegal gambling, and data-harvesting" and that this "disqualifies" companies in which Tang invests from pursuing new ventures.

78.     No reasonable person under the circumstances would have published the defamatory statements in the Report.

79.     Defendants authored and caused the defamatory statements to be published to the public with knowledge of their falsity, or at the very least, with reckless disregard as to their veracity.

80.     As a direct and proximate result of the defamatory statements, Tang has suffered presumed, actual, and special damages, including humiliation, embarrassment, injury to his reputation, lost business opportunities, impairment of his ability to conduct business, and other pecuniary damage.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Hao Tang respectfully requests that this Court enter judgment against Defendants, as follows:

-20-

81.     Award Tang compensatory and actual damages, in an amount to be determined at trial, but in no event less than $75,000;

82.     Award Tang presumed and special damages, in an amount to be determined at trial;

83.     Award Tang punitive damages for Defendants' willful, wanton, and malicious conduct and to deter similar conduct in the future, in an amount to be determined at trial;

84.     Award Tang pre- and post-judgment interest; and

85.     Grant such other relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff Hao Tang demands a trial by jury of all issues so triable.

Dated: June 12, 2026                    WINSTON TAYLOR LLP


By: */s/ Lisa Coutu*

Lisa Coutu
WINSTON TAYLOR LLP
200 Park Avenue
New York, NY 10166
T: (212) 294-6639
Lisa.Coutu@winstontaylor.com

Libby Deshaies (*pro hac vice* application forthcoming)
Sean Suber (*pro hac vice* application forthcoming)
WINSTON TAYLOR LLP
300 N. LaSalle Drive
Chicago, Illinois 60654
T: (312)558-3738
Libby.Deshaies@winstontaylor.com
Sean.Suber@winstontaylor.com

*Attorneys for Plaintiff Hao Tang*